IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 6, 2018

**STATE OF TENNESSEE v. ARTHUR MCKINNIE**

**Appeal from the Circuit Court for Madison County**
**No. 17-266     Roy B. Morgan, Jr., Judge**

_____

**No. W2018-00439-CCA-R3-CD**

_____

The Defendant, Arthur McKinnie, was indicted for attempted first degree murder, a Class A felony; aggravated assault, a Class C felony; employment of a firearm during the commission of a dangerous felony, a Class C felony; reckless endangerment with a deadly weapon, a Class E felony; and tampering with evidence, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-103, -13-202, -16-503, -17-1324. The Defendant proceeded to a jury trial. The trial court granted the Defendant's motion for judgment of acquittal on the tampering with evidence charge. The jury convicted the Defendant of the lesser-included offense of attempted voluntary manslaughter, a Class D felony, and the charged offenses of aggravated assault and reckless endangerment. See Tenn. Code Ann. §§ 39-12-101, -13-211. The jury acquitted the Defendant of the employment of a firearm charge. The trial court imposed a total effective sentence of ten years. On appeal, the Defendant contends that (1) the evidence was insufficient to sustain his conviction for attempted voluntary manslaughter; (2) the trial court abused its discretion in setting the length of his sentences; and (3) the trial court abused its discretion in imposing partial consecutive sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

G. Michael Casey, Jackson, Tennessee, for the appellant, Arthur McKinnie.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Rolf G. S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# FACTUAL BACKGROUND

Aristotle Woodson testified that he was the Defendant's cousin. Mr. Woodson recalled that in January 2017 he had been living with the Defendant and the Defendant's wife in their duplex apartment for six to eight months. On January 28, 2017, Mr. Woodson was in the apartment watching television when the Defendant "knocked at the door." Mr. Woodson let the Defendant in the apartment. Mr. Woodson recalled that the Defendant "was acting real calm" and went into the kitchen.

Once in the kitchen, the Defendant "started blabbing something about why [Mr. Woodson] told [the Defendant's] wife that he went down to Bolivar." Mr. Woodson told the Defendant that he did not know why and that he "didn't think it was [a] big deal." Mr. Woodson explained that it was common for the Defendant to go to Bolivar to drink and "visit his friends and cousins." Mr. Woodson testified that he would often accompany the Defendant on these trips to Bolivar. Mr. Woodson denied that the Defendant had a girlfriend in Bolivar.

Mr. Woodson testified that the Defendant became upset and began arguing with him. The Defendant "grabbed [Mr. Woodson] and pushed [him] out" of the apartment. Mr. Woodson stood in the hallway of the duplex "for a second." He then went back and knocked on the Defendant's door to ask for his cell phone. Mr. Woodson testified that he heard a zipper and then heard the Defendant "cock [a] gun." The Defendant opened the door holding a sawed-off shotgun. Mr. Woodson had previously seen the shotgun. Mr. Woodson recalled that the Defendant kept the shotgun in a green case with a zipper and that the Defendant had threatened the Defendant's wife with the shotgun a few months before this incident.

When the Defendant opened the door, he pointed the shotgun at Mr. Woodson. Mr. Woodson testified that he "was standing right directly in front of . . . [the] gun." The Defendant said, "I'll kill you, mother f--ker." Mr. Woodson heard a "little kick" and "moved out of the way" as the Defendant fired the shotgun. Mr. Woodson testified that he was afraid he was going to die and ran to a neighboring house as "[f]ast as [he] could." Mr. Woodson hid behind the house and called 911. While waiting on the police, Mr. Woodson saw the Defendant leave the apartment and drive away. Mr. Woodson did not go back to the apartment until after the Defendant was arrested.

Demetrius Moore testified that she lived with her godmother in the apartment across from the Defendant's apartment. Ms. Moore heard people "arguing outside [her] door." When she looked out the peephole of her door, she saw Mr. Woodson standing in the hallway "asking for his phone and just saying he wanted his phone." Ms. Moore saw the Defendant open the door, "cock the shotgun," say, "Didn't I tell you to get the f--k

away from my door," and fire the shotgun. Ms. Moore testified that the Defendant was angry when he opened the door. Ms. Moore estimated that the barrel of the shotgun was less than a foot away from Mr. Woodson.

The shot went through the wall of Ms. Moore's apartment just to the left of the doorframe "and it kind of grazed [her] couch." Ms. Moore's godmother was lying on the couch when the shot grazed "the top" of it. Ms. Moore could not see what happened to Mr. Woodson because of the smoke from the shotgun. Ms. Moore estimated that the entire incident lasted two or three minutes. Ms. Moore testified that she "thought [they] [were] going to all die" when the Defendant fired the shotgun.

Officer Christopher Austin of the Jackson Police Department responded to the duplex. The Defendant was arrested at the backdoor of his apartment. Officer Austin did not smell alcohol on the Defendant and did not think the Defendant was intoxicated when he was arrested. A spent shotgun shell was found in the hallway of the duplex, but the shotgun was never recovered. Officer Austin testified that the shot entered the wall of Ms. Moore's apartment near the door latch, approximately four and a half feet off the ground.

The Defendant testified that he and his wife took Mr. Woodson in about a year before the shooting because Mr. Woodson "didn't have [any]where to go." The Defendant denied being angry at Mr. Woodson or arguing with him. The Defendant explained that it "wasn't [a] big deal" that Mr. Woodson had told his wife that they had gone to Bolivar because they went there "all the time." Instead, the Defendant claimed that he asked Mr. Woodson to step outside while he cooked because he liked to "move around and cook." The Defendant further claimed that he "was a little bit loud" because he had "a few drinks" that day.

The Defendant testified that when Mr. Woodson knocked on the apartment door, he "got the gun." The Defendant explained that he "was just messing with [Mr. Woodson] some" and "was just being reckless, being stupid." The Defendant claimed that he did not know that the shotgun was loaded because he had not "shot . . . [it] in years." The Defendant admitted that he cocked the shotgun, but claimed that he did so to scare Mr. Woodson because Mr. Woodson was "easy to scare." The Defendant denied that he threatened to kill Mr. Woodson.

The Defendant testified that he told Mr. Woodson to go back to the front porch of the duplex and that he "pretty much escorted [Mr. Woodson] back out toward the main door." The Defendant claimed that, as he was returning to his apartment, he "pulled the gun back" to avoid its muzzle hitting Ms. Moore's doorframe and the shotgun accidently went off. The Defendant estimated that the muzzle of the shotgun was less than six inches away from the wall to Ms. Moore's apartment when the shotgun was fired.

The Defendant denied that he fired the shotgun with the intent of killing Mr. Woodson or harming anyone else. The Defendant claimed that if he wanted to kill Mr. Woodson, he would have fired the shotgun as soon as he opened the door to the apartment and would have aimed higher, toward Mr. Woodson's head, when he fired.

Based upon the foregoing, the trial court granted the Defendant's motion for judgment of acquittal on the tampering with evidence charge. The jury convicted the Defendant of the lesser-included offense of attempted voluntary manslaughter and the charged offenses of aggravated assault and reckless endangerment with a deadly weapon. The jury acquitted the Defendant of the employment of a firearm charge.

The Defendant's presentence report was entered into evidence at his sentencing hearing. It revealed that the Defendant had prior convictions for domestic assault, assault, driving under the influence, driving with a revoked license, drug possession, and numerous traffic offenses. The Defendant was classified as a Range I, standard offender. In setting the length of the Defendant's sentences, the trial court found that no mitigating factors applied and that one enhancement factor, that the Defendant had a history of criminal behavior, applied. The trial court sentenced the Defendant to the maximum sentence for each conviction: four years for the attempted voluntary manslaughter conviction, six years for the aggravated assault conviction, and two years for the reckless endangerment conviction.

The trial court then imposed partial consecutive sentences for a total effective sentence of ten years. The trial court ordered that the four-year and six-year sentences be served consecutively to each other, but concurrently with the two-year sentence. In doing so, the trial court found that the Defendant was a dangerous offender "whose behavior indicate[d] little or no regard for human life, [and had] no hesitation about committing a crime in which the risk to human life [was] high." The trial court also found that "confinement for an extended period of time [was] necessary to protect society" from the Defendant, noting that the Defendant had prior convictions for "acts involving violence" and that this "indicated a high risk for possibly violent actions in the future." The trial court further found that "the aggregate length of the sentence[s] reasonably relate[d] to the offense[s] for which the Defendant [was] convicted," noting that "the circumstances surrounding the commission of the offense[s] [were] aggravated."

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for attempted voluntary manslaughter. The Defendant argues that there was no evidence that he intended to shoot or kill Mr. Woodson. The Defendant further argues

that his "version of events makes more logical sense and is more consistent with the crime scene" than the testimony of Mr. Woodson. The State responds that the evidence was sufficient to sustain the Defendant's conviction for attempted voluntary manslaughter.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. As charged to the jury, a person commits criminal attempt when, "acting with the kind of culpability otherwise required for the offense," the person "[a]cts with intent to cause a

result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

Mr. Woodson testified that the Defendant became angry at the fact that Mr. Woodson had told the Defendant's wife "that he went down to Bolivar." The Defendant "grabbed [Mr. Woodson] and pushed [him] out" of the apartment. When Mr. Woodson knocked on the door to retrieve his cell phone, he heard the Defendant take the shotgun out of its case and "cock" it. The Defendant opened the door, pointed the shotgun at Mr. Woodson, said, "I'll kill you, mother f--ker," and fired the shotgun while Mr. Woodson "was standing right directly in front of . . . [the] gun."

Moreover, Ms. Moore testified that she heard people "arguing outside [her] door." When she looked out the peephole, she saw Mr. Woodson standing in the hallway. The Defendant opened the door to his apartment, "cock[ed] the shotgun," said to Mr. Woodson, "Didn't I tell you to get the f--k away from my door," and fired the shotgun. Ms. Moore testified that the Defendant was angry prior to firing the shotgun and that the barrel of the shotgun was less than a foot away from Mr. Woodson when the Defendant fired.

The Defendant argues that his "version of events makes more logical sense and is more consistent with the crime scene" than Mr. Woodson's testimony. However, as noted above, questions of witness credibility and conflicts in the testimony are the province of the jury. See Bland, 958 S.W.2d at 659. The jury chose to reject the Defendant's testimony and accredit the testimony of Mr. Woodson and Ms. Moore. We will not revisit that determination or reweigh the evidence relied on by the jury. See Sheffield, 676 S.W.2d at 547. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for attempted voluntary manslaughter.

## II. Length of Sentences

The Defendant contends that the trial court abused its discretion by imposing the maximum sentence for each conviction. The Defendant argues that the trial court "should have sentenced him to the minimum sentence[s]" because only one enhancement factor was applied by the trial court and because his "last assault related offenses occurred some time ago." The State responds that the trial court did not abuse its discretion in setting the length of the Defendant's sentences.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W3d 682, 709 (Tenn. 2012) (internal quotation

marks omitted).[1]  A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred.  State v. Carter, 254 S.W.3d 335 (Tenn. 2008).  Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706.  On appeal, the burden is on the defendant to show that the sentence is improper.  Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102.  In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles.  The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).  Sentences involving incarceration "should be based on the following considerations":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2).  Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

Additionally, the trial court must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative

---

[1] In his brief, the Defendant incorrectly asserts that review of sentencing issues is de novo despite our supreme court having announced the Bise standard of review over six years ago.

Office of the Courts as to Tennessee sentencing practices for similar offenses; (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (h) the results of validated risk and needs assessment contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that [a] trial court[] adhere[s] to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulates in the record its reasons for imposing the specific sentence. Bise, 380 S.W.3d at 705 n.41.

Here, the trial court sentenced the Defendant within the appropriate statutory range for each conviction, addressed the purposes and principles of the Sentencing Reform Act, and articulated in the record its reasons for imposing the sentences. The presence of one enhancement factor and no mitigating factors was sufficient for the trial court to sentence the Defendant to the maximum for each conviction, especially in light of the fact of the Defendant's lengthy criminal history consisting of prior convictions for domestic assault, assault, driving under the influence, driving with a revoked license, drug possession, and numerous traffic offenses. The fact that the Defendant's "last assault related offenses occurred some time ago" does not constitute an abuse of the trial court's discretion in using this enhancement factor to impose the maximum sentences. Accordingly, we conclude that the Defendant has failed to show that the trial court abused its discretion in setting the length of the Defendant's sentences.

### III. Consecutive Sentencing

The Defendant contends that the trial court abused its discretion by imposing partial consecutive sentences. The Defendant argues that the trial court erred by finding that he was a dangerous offender, noting that his defense was "that he was acting reckless[ly] and being stupid" when he fired the shotgun. The State responds that the trial court did not abuse its discretion in imposing partial consecutive sentences.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis of the dangerous

offender category, it must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). The trial court must make specific findings about what "particular facts" show that the Wilkerson factors apply to the defendant. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

After becoming angry with Mr. Woodson, the Defendant told Mr. Woodson he would kill him and fired a shotgun at Mr. Woodson in the hallway of their duplex. Mr. Woodson "was standing right directly in front of . . . [the] gun," less than a foot away, when the Defendant fired at him. The shot went through the wall of Ms. Moore's apartment and grazed her couch. Ms. Moore's godmother was lying on the couch when it was struck by the shot. Both Mr. Woodson and Ms. Moore testified that they feared for their lives during the incident. In addition to this, the trial court found that an extended sentence was necessary to protect the public against further criminal conduct by the Defendant, noting the Defendant's lengthy criminal history that included prior convictions for "acts involving violence." The trial court also found that consecutive sentences reasonably related to the severity of the offenses, noting that that "the circumstances surrounding the commission of the offense[s] [were] aggravated." Accordingly, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE